IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

WHITE COUNTY HIGH SCHOOL        :
PEERS RISING IN DIVERSE         :
EDUCATION, an Unincorporated    :
Association; KERRY PACER and    :
LINDSAY PACER, by and through   :
their Next Friends SAVANNAH     :
PACER and WILLIAM PACER;        :
CHARLENE HAMMERSEN, by and      :
through her Next Friend ELEANOR :
BERRONG; and KIMBERLEE          :
GOULD, by and through her Next  :
Friend KIMBERLEE HILTS,         :
                                :
        Plaintiffs,             :
                                :     CIVIL ACTION
v.                              :     NO. 2:06-CV-29-WCO
                                :
WHITE COUNTY SCHOOL             :
DISTRICT d/b/a WHITE COUNTY     :
PUBLIC SCHOOLS; and PAUL        :
SHAW, as Superintendent of White :
County School District; BRIAN   :
DORSEY, as Principal of White   :
County High School; SANDY BALES, :
as Assistant Principal of White County:
High School; and RODNEY GREEN,  :
as Principal of White County Ninth :
Grade Academy, in their Official and :
Individual Capacities,          :
                                :
        Defendants.             :

## ORDER

The captioned case is before the court for consideration of plaintiffs'

motion for preliminary injunction [2-1].

## I.    Factual Background

White County High School Peers Rising in Diverse Education ("PRIDE") is a noncurricular student group commonly known as a gay-straight alliance ("GSA"). (Compl. ¶ 8.) The individual plaintiffs are students at White County High School ("WCHS") who are members of PRIDE. (Id. ¶¶ 9-12.) They bring this action by and through their parents and legal guardians. (Id.) Plaintiffs wish to meet "to support those who have been bullied or harassed because of their identity . . . in particular . . . to support students who are lesbian, gay, bisexual, or transgender." (Id. ¶ 8.)

Defendant White County School District ("WCSD") is a public school system in the state of Georgia, comprised of five schools, including one high school, WCHS. (Id. ¶ 13.) WCHS is a public secondary school that receives federal financial assistance. (Id. ¶ 95.) Defendant Paul Shaw is the Superintendent of WCSD. (Id. ¶ 14.) Defendant Bryan Dorsey is the Principal of WCHS and has been formally delegated decision-making authority over matters concerning noncurricular student groups. (Id. ¶ 15.) Defendant Sandy Bales is the Assistant Principal of WCHS. (Id. ¶ 16.) Defendant Rodney Green is the Principal of White County Ninth Grade Academy ("WCNGA"). (Id. ¶ 17.)

In January 2005, after defendant Dorsey became the new Principal of WCHS, plaintiff Kerry Pacer met with him and requested recognition of a GSA. (Id. ¶ 18; Dorsey Aff. ¶ 3.)  Dorsey told her to submit her request in writing with an explanation of her reasons for wanting to start a GSA.  (Compl. ¶ 20.)  Pacer submitted a paper stating that she wished to start a GSA to create a "safe ground" for lesbian, gay, bisexual, or transgender students who experienced bullying at school.  (Id. ¶ 21.)  Dorsey, however, denied the request.  (Id. ¶ 22.) Throughout the month of January, Pacer and some of the other plaintiffs met with both Dorsey and Shaw to discuss the formation of a GSA.  (Id. ¶¶ 23-25.)

On January 31, 2005, Shaw informed plaintiffs via letter that they could proceed with the formation of a GSA but that they should provide Dorsey with certain information, including a list of proposed members and proposed by-laws, before the organization would be recognized by the school.  (Id. ¶ 26.) Plaintiffs allege that no other noncurricular student group was subjected to such a lengthy and formal process before recognition.  (Id. ¶¶ 20, 26, 33, 40.) Plaintiffs' request, however, had become the subject of public controversy within the school and community, even generating some protests outside the school building. (Dorsey Aff. ¶ 8.) Several students wore t-shirts with messages of opposition to the proposed GSA.  (Compl. ¶ 32.)  Dorsey also claims that he received requests to form other potentially controversial clubs, including a

"Redneck Club," a "Wiccan Club," and a "Southern Heritage Club." (Dorsey Aff. ¶ 8.)

In February 2005, plaintiffs adopted the name PRIDE and reworded the organization's mission statement to encompass bullying and harassment of all students for whatever reason.  (Id. ¶ 37.)  On March 21, 2005, plaintiffs were informed that the school had formally recognized their organization and that they were permitted to meet on campus during noninstructional time. (Id. ¶ 40.) Plaintiffs were also informed that defendant Bales was required to be present at every meeting. (Id.) Plaintiffs met on campus approximately three times during the remainder of the 2004-2005 school year.  (Id. ¶¶ 42, 45.)

During a Board of Education meeting in March 2005, Dorsey made several recommendations for improvements and changes in the operation of WCHS, including limiting student clubs and organizations to those related to school curricula and programs.  (Dorsey Aff. ¶ 7.)  As part of its comprehensive study and review of all aspects of the school system, the Board created twenty-three committees, including one to study clubs and organizations. (Id. ¶ 9, Ex. 1.) On June 16, 2005, the committees presented their reports to the Board.  The clubs and organizations committee recommended the elimination of all noncurriculum-related clubs and organizations.  (Compl. ¶ 46.)

4

Dorsey decided to accept this recommendation.  (Dorsey Aff. ¶ 9.)  He then reviewed the clubs and organizations that he was aware had met during the previous school year.  (Id. ¶ 10.)  He decided that four clubs, the Fellowship of Christian Athletes ("FCA"), Key Club, Interact Club, and PRIDE, would not be permitted to meet during the 2005-2006 school year.  (Id.)

Based on this decision and the new school policy, plaintiffs have not been permitted to meet during the 2005-2006 school year.  (Compl. ¶ 48.)  Plaintiffs claim that the decision to ban all noncurricular student groups was motivated by a desire to ban PRIDE and to suppress the content and viewpoint of its members' speech.  (Compl. ¶ 4.)  Plaintiffs assert that, despite the ban on noncurricular student groups, several allegedly noncurricular groups, including the Student Council, Youth Advisory Council ("YAC"), Shotgun Club, Beta Club, a prayer group, Dance Team, the Family, Career and Community Leaders of America ("FCCLA"), Cheerleaders, and sports-related teams or groups, have continued to meet and organize activities on campus during noninstructional time during the 2005-2006 school year.  (Id. ¶¶ 50-58.)  Plaintiffs also allege that WCHS allows, encourages, and facilitates some of these groups to meet by, among other things, permitting them to use the school's public address system to publicize their meetings.  (Id.)

On February 27, 2006, plaintiffs filed this lawsuit.  Plaintiffs' complaint raises eleven claims against defendants for violations of the Equal Access Act (Count I), the First and Fourteenth Amendments of the United States Constitution (Count II), and the Georgia Constitution (Count III).  Plaintiffs allege that defendants' discrimination against PRIDE violates their rights under the Equal Access Act as well as their rights to expressive association under both the federal and state constitutions.  Plaintiffs further allege that defendants' deliberate indifference to the harassment and discrimination of gay, lesbian, and bisexual students violates their rights to equal protection under both the federal and state constitutions.  Plaintiffs also claim that defendants' dress code policies are facially overbroad and vague in violation of both the federal and state constitutions.  Plaintiffs allege that defendants' application of these dress code policies and other censorship by defendants have deprived plaintiffs of their right to free expression under both the federal and state constitutions.

Along with their complaint, plaintiffs filed a motion requesting preliminary injunctive relief with respect to Counts I, II, and III of their complaint.  Plaintiffs seek an injunction ordering defendants to: (1) recognize PRIDE as a noncurricular student group; (2) permit PRIDE to meet, at a minimum, on terms equal to those on which any other noncurricular student group has met during the 2005-2006 school year, including enjoyment of school

privileges; and (3) not seek retaliation against PRIDE or its members. Defendants have filed a response in opposition to this motion. On June 16, 2006, a hearing was held on the matter where the court heard testimony and received documentary evidence.

Prior to the hearing, the court ordered that the preliminary injunction hearing be consolidated with the trial on the merits of plaintiffs' claims pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. Therefore, this order will constitute the final adjudication on the merits of the claims asserted in Counts I, II, and III of the complaint.

## II.   Permanent Injunction

To be entitled to a preliminary injunction, the moving party must establish the following: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." Siegel v. Lepore, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). An injunction is a drastic remedy that should not be imposed unless the moving party establishes each of the four prerequisites. Id.

The standard for a permanent injunction is essentially the same; however, to obtain a permanent injunction, the plaintiff must show actual success on the

merits rather than a likelihood of success.  <u>Klay v. United Healthgroup, Inc.</u>, 376

F.3d 1092, 1097 (11th Cir. 2004).  The plaintiff must also demonstrate lack of an

adequate remedy at law.  <u>Newman v. Ala.</u>, 683 F.2d 1312, 1319 (11th Cir. 1982).

### A.   Actual Success on the Merits

Plaintiffs assert that they are entitled to an injunction based on

defendants' violation of the Equal Access Act as well as the federal and state

constitutions.   Thus, the court must address whether plaintiffs have

demonstrated that they will succeed on the merits of these claims.

### 1.   Equal Access Act

The Equal Access Act ("EAA") provides as follows:

> It shall be unlawful for any public secondary school which receives
> Federal financial assistance and which has a limited open forum to
> deny equal access or a fair opportunity to, or discriminate against,
> any students who wish to conduct a meeting within that limited
> open forum on the basis of the religious, political, philosophical, or
> other content of the speech at such meetings.

20 U.S.C. § 4701(a).  Under the EAA, a "limited open forum" exists whenever a

public secondary school "grants an offering to or opportunity for one or more

noncurriculum related student groups to meet on school premises during

noninstructional time."  20 U.S.C. § 4071(b).  Thus, "if a public secondary school

allows only one 'noncurriculum related student group' to meet, the Act's

obligations are triggered and the school may not deny other clubs, on the basis

of the content of their speech, equal access to meet on school premises during noninstructional time." Bd. of Educ. of Westside Cmty. Schs. v. Mergens, 496 U.S. 226, 236 (1990). Congress defined "meeting" under the EAA to include "those activities of student groups which are permitted under a school's limited open forum and are not directly related to the school curriculum." 20 U.S.C. § 4072(3).

The parties agree that WCHS is a public secondary school that receives federal financial assistance; however, the parties are in dispute as to whether WCHS has created a "limited open forum" as defined in the EAA. To determine whether WCHS has a limited open forum such that the EAA's obligations are triggered, the court must evaluate whether the student groups identified by plaintiffs are "noncurriculum related" and whether any such groups have been "grant[ed] an offering to or an opportunity [to] . . . meet on school premises." 20 U.S.C. § 4071(b).

Congress did not define the term "noncurriculum related student group" in the EAA itself. In Mergens, however, the Supreme Court interpreted the term "broadly to mean any student group that does not directly relate to the body of courses offered by the school." 496 U.S. at 239. The Court further explained that a student group directly relates to a school's curriculum where one of the following applies: (1) "the subject matter of the group is actually taught, or will

9

soon be taught, in a regularly offered course;" (2) "the subject matter of the group concerns the body of courses as a whole;" (3) "participation in the group is required for a particular course;" or (4) "participation in the group results in academic credit." Id. at 239-240.

In Mergens, the Supreme Court identified three student groups as "noncurriculum related:" (1) Subsurfers (a club for students interested in scuba diving); (2) the chess club; and (3) Peer Advocates (a service group that works with special education classes). 496 U.S. at 245-46. The Court noted that, despite the fact that the school taught swimming, scuba diving was not taught in any regularly offered course at the school. Id. at 245. Similarly, the Court pointed out that, although math teachers encouraged students to play chess, chess was not taught in any regularly offered course. Id. As for Peer Advocates, the Court found that it was not directly related to any courses offered by the school and was not required by any of these courses. Id. at 246.

The Supreme Court rejected the argument that "curriculum related" means "anything remotely related to abstract educational goals," as such definition would "render the [EAA] merely hortatory" and "permit[] schools to evade the [EAA] by strategically describing existing student groups." Id. at 244. While the Court's definition has been recognized as "exceptionally difficult to

10

apply," id. at 280 (Stevens, J., dissenting), it is the only definitive guide for this court as there are no Eleventh Circuit cases construing the EAA.[1]

To show the existence of a "limited open forum" at WCHS, plaintiffs submit seven student groups, each of which plaintiffs contend is "noncurriculum related" and "meet[s] on school premises:" (1) Beta Club; (2) Dance Team; (3) Student Council; (4) Youth Advisory Council (YAC); (5) Prayer Group; (6) Shotgun Team/4-H Club; and (7) Prom Group.[2] Prior to the June 16, 2006 hearing, the parties filed a joint statement of the case [30-1] that narrowed the issues. Therefore, the court need address only the issues that are still in dispute regarding these student groups.

Defendants have the burden of showing that the groups identified by plaintiffs are directly related to the WCHS curriculum. Mergens, 496 U.S. at 240. Plaintiffs, however, have the burden of showing that these groups actually meet on school premises. If the court finds that any one of these groups is noncurriculum related and meets on school premises, the EAA's requirements

---

[1] This court will, however, look for guidance in decisions by courts in other circuits wherein the Mergens test has been applied.

[2] In their initial motion for a preliminary injunction and accompanying brief, plaintiffs' list of allegedly noncurriculum related student groups included the Family Career and Community Leaders of America ("FCCLA") and did not include the Prom Group. As plaintiffs presented no evidence at the hearing regarding the FCCLA, the court will make no determinations regarding this student group or its curriculum relatedness.

11

are triggered.  Mergens, 496 U.S. at 237.  Defendants request that if this court finds that they have created a "limited open forum," the court's ruling on plaintiffs' motion for injunctive relief detail which of the student groups is noncurriculum related.  Plaintiffs claim that such relief is unwarranted.  The court recognizes the need for school districts to be able to plan prospectively with regard to school affairs.  Thus, in this order, the court will attempt to provide defendants with some guidance by addressing each of the seven groups identified by plaintiffs.

### a.    Beta Club

Beta Club has been recognized by defendants as a student group and has been permitted to meet on school premises during noninstructional time and to otherwise enjoy school privileges.  The evidence presented demonstrates that membership in Beta Club is extended by invitation to any student who achieves a certain academic standard in the school's core curriculum.  Students who choose to participate in this group may earn the right to wear a special stole at graduation by participating in a certain number of hours of community service.  The club's activities include participating in fundraisers to provide scholarships to its members.

Defendants claim that Beta Club is curriculum related because it concerns the body of courses as a whole.  Defendants base this contention on the fact that

Beta Club honors students who have achieved high academic standards in the core curriculum. Plaintiffs, however, point to the actual content of Beta Club meetings, which does not involve the discussion of school curriculum. Plaintiffs also contend that the manner in which a student group's members are chosen is irrelevant to the legal analysis of Mergens.

Although the court recognizes that Congress intended a low threshold for triggering the EAA's requirements, this court rejects the notion that the term "curriculum related" is so narrow that an otherwise curriculum-related student group could be found noncurriculum related if it were to also engage in community service and social activities. See East High, 81 F. Supp. 2d at 1179 ("curriculum-related student groups, like noncurricular student groups, need not serve merely as an extension of the classroom experience in order to avoid triggering the Act's protections. Members of a curriculum-related group may socialize, raise funds, and even assist others as part of their group activities without altering the group's status under the Act.") Furthermore, the court does not think that a group's selection or eligibility criteria is totally irrelevant to its curriculum relatedness if that criteria is directly related to the curriculum itself.

In analyzing whether the student group relates to the body of courses as a whole, the court finds that a group's purpose as well as its activities comprise its "subject matter." The main purpose of Beta Club is to honor students'

performance in the core curriculum.  The court does not find this to be merely a broadly defined educational goal.  Rather, membership in Beta Club is a recognition of a student's achievement in academics.  The Supreme Court's only example of a group directly related to the curriculum based on the fact that its subject matter "concerns the body of courses as a whole" was a student government group based on the idea that such a group would engage in curricular planning.  Id. at 240.  In Pope v. East Brunswick Board of Education, 12 F.3d 1244, 1252 (3d Cir. 1993), the Third Circuit expressed doubt that this principle extended any further than this particular example.  Nevertheless, this court is at a loss to understand what group could be more closely related to the body of courses as a whole than a student group whose membership is determined based on whether a student had achieved a sufficiently high grade point average in the school's core courses.  Although the content of Beta Club meetings may involve noncurriculum related activities, the court finds that the group's main purpose, honoring academic excellence, is directly related to the curriculum.[3]  Thus, the court finds that Beta Club is "curriculum related" under

---

[3] The court does not think that this finding will "render the [EAA] merely hortatory" and allow schools to evade the EAA's requirements by placing academic eligibility requirements on all students groups to bring them within the definition of "curriculum related."    Mergens, 496 U.S. at 244.    A noncurriculum-related student group would not become curriculum related simply because its members were required to maintain a particular academic standard in order to participate.  Beta Club is directly related to the curriculum

Mergens such that its existence at WCHS does not trigger the EAA's requirements.

### b.  Dance Team

Dance Team is a student group that has been officially recognized by defendants and has been permitted to meet on school premises and to otherwise enjoy school privileges.  Dance Team provides entertainment during basketball games.  Dance is not actually taught and will not soon be taught in a regularly offered course.  Participation in Dance Team is not required for any particular course and it does not result in academic credit.  The parties dispute whether Dance Team concerns the body of courses as a whole.

Defendants argue that Dance Team supports the curriculum and the programs of the school.[4]  Defendants, however, can connect Dance Team only to the basketball team and in only a support role.  The Supreme Court's definition of "curriculum related" focuses on "courses" and refers to material

---

because academic achievement is the sole criterion by which membership is determined.  Furthermore, the evidence demonstrates that all students who achieve a particular academic standard are invited to join Beta Club.

[4] Defendants' basis for this contention is that Dance Team is similar to cheerleading and extracurricular sports.  Although the question of the curriculum relatedness of cheerleading and extracurricular sports is not currently before this court, it is not clear to the court that these activities could be considered "curriculum related" within the scope of the EAA.  Mergens did not directly address these types of activities.

for which students receive "academic credit." <u>Mergens</u>, 496 U.S. at 239-40. Thus, the definition of "curriculum" appears to be limited to academics.[5] It follows then that the phrase "body of courses as a whole" also concerns academics. Defendants have made no effort to show that Dance Team is in any way related to any <u>course</u> that is actually taught as part of the school's curriculum or to any <u>academic</u> material. Defendants also fail to connect Dance Team to the body of courses as a whole through an activity such as curricular planning. Rather, defendants argue that the Dance Team is tangentially related to the school's athletic program.[6] It is clear to the court that this is insufficient to support a finding that Dance Team concerns the body of courses as a whole. Thus, the court finds that Dance Team is noncurriculum related and that, by permitting

---

[5] Indeed, the Supreme Court noted that the common meaning of the term "curriculum" is "the whole body of courses offered by an educational institution or one of its branches." <u>Mergens</u>, 496 U.S. at 237 (quoting Webster's Third New International Dictionary 557 (1976)). Interestingly, another definition of "curriculum" is "all planned school activities including besides courses of study organized play, athletics, dramatics, clubs, and home-room program." Webster's Third 557. Clearly, this was not the definition intended by the Supreme Court as it would necessarily have included the very clubs found to be noncurriculum related. However, the latter definition is helpful to this court in that it distinguishes other activities, such as "athletics," from "courses of study." <u>See</u> <u>id.</u>

[6] There is no evidence before the court that basketball is taught in any regularly offered course at WCHS. Even if it were, the court is not certain whether a student group which "supports" a sports team, even a curriculum-related one, could itself be considered "curriculum related." The connection to the curriculum appears too tenuous in such a case.

Dance Team the opportunity to meet on school premises during noninstructional time, defendants have created a limited open forum.

### c. Student Council

Defendants have recognized a student group known as Student Council and have permitted it to meet on school premises during noninstructional time and to otherwise enjoy school privileges. Participation in Student Council is not required and does not result in academic credit. Defendants contend that Student Council's subject matter concerns the body of courses as a whole and that its subject matter is actually taught in a regularly offered course.

Defendants argue that Student Council is curriculum related as it is an elected, representative group of students serving as a liaison between the student body and the school administration, raising concerns and suggestions from the student body. In Mergens, the Supreme Court stated that "[a] school's student government would generally relate to the curriculum to the extent that it addresses concerns, solicits opinions, and formulates proposals pertaining to the body of courses offered by the school." 496 U.S. at 240 (emphasis added). The evidence presented in this case shows that the actual subject matter of Student Council is raising student concerns with regard to facilities and planning noncurricular activities such as the Homecoming Dance, the Spring Dance, class t-shirt sales, and fundraisers. Defendants have presented no

17

evidence to establish that Student Council raised concerns or suggestions that pertained to academic courses or that Student Council was involved in any curricular planning.[7]  Thus, the court finds that the subject matter of Student Council did not concern the body of courses as a whole.

Defendants also argue that Student Council is associated with the social studies curriculum of the school as it teaches representative government as well as the process by which representatives are chosen.  Plaintiffs argue that the government process is not the actual subject matter of Student Council's meetings; rather, plaintiffs claim, the subject matter of these meetings is community service and social event planning.  As the court noted above in its discussion of the curriculum relatedness of Beta Club, an otherwise curriculum-related student group may engage in other activities without becoming noncurricular itself.  However, when analyzing whether a student group is curriculum related under the first prong of the Mergens test, whether the group's subject matter is actually taught in a regularly offered course, the court must consider the subject matter of the group.[8]

---

[7] Mr. Dorsey did testify that a student approached him to suggest that the school offer French classes.  However, Mr. Dorsey was unsure whether this particular student was asking on behalf of Student Council or whether the student was even a member of Student Council.

[8] The analysis here of Student Council's curriculum relatedness is slightly different than the court's analysis above regarding the Beta Club's relation to the

Defendants argue that the subject matter of Student Council includes raising issues of concern or suggestions from the student body and teaching representative government.  The Supreme Court rejected the argument that "'curriculum related' means anything remotely related to abstract educational goals."  Mergens, 496 U.S. at 244.  However, providing students a model of representative government is more than just a broadly defined educational goal of the same ilk as "enhanc[ing] students' ability to engage in critical thought processes" or "enabling students to develop life-long recreational interests." See id. The electoral process and the manner in which a representative government operates could be concretely related to the actual subject matter taught in a high school government course.

Nevertheless, the court finds that defendants have failed to meet their burden of showing that Student Council is directly related to the school's social studies program.  Although defendants argue that Student Council promotes a deeper understanding of the concepts taught in social studies courses, defendants fail to provide evidence that the group's subject matter is "actually taught" in these courses.  See id. at 240, 244 (chess club not curriculum related

---

school's curriculum.  When determining whether the Beta Club was curriculum related, the court focused on how its subject matter related to the body of courses as a whole.  Here, however, the court is considering whether Student Council's subject matter is actually taught in a regularly offered course.

merely because the subject matter related to math and science by building the ability to engage in critical thought processes; however, French club directly related to curriculum if school teaches French); <u>see also</u>, <u>Pope</u>, 12 F.3d at 1253 (Key Club found noncurricular as its subject matter of community-related service and fund-raising activities was not actually taught in History course's unit on poverty and homelessness).  Defendants have not provided evidence to establish that any course at WCHS actually teaches students about the election process or about representative government.  As defendants have failed to show that Student Council, a student group that has been allowed to meet on school premises during noninstructional time, is curriculum related, the court finds that WCHS has created a limited open forum.

### d.    Youth Advisory Council (YAC)

Defendants have recognized a group known as YAC and have permitted it to meet on school premises during noninstructional time and to otherwise enjoy school privileges.  Participation in YAC is not required for a particular course and does not result in academic credit.  YAC is a student advisory council to the school's guidance and counseling department.  YAC's subject matter includes issues regarding teen pregnancy and drug, alcohol, and tobacco use.

The parties dispute whether YAC is a "student group" within the meaning of the EAA. The basis for defendants' contention that YAC is not a student group for purposes of the EAA is that its members are appointed by school counselors. As the court noted above in its discussion of Beta Club's curriculum relatedness, a student group's selection criteria may be relevant to determining whether the group is directly related to the school's curriculum.[9] However, the court finds that the fact that a student group's members are selected by the school's faculty or staff does not necessarily mean that the group is not a "student group" under the EAA. To place such a group outside the scope of the EAA would "render the act merely hortatory" by allowing schools to escape its requirements by having the faculty select members for all student groups regardless of the group's actual connection to the curriculum. Mergens, 496 U.S. at 244; see also, Pope, 12 F.3d at 1250-51 ("A limitation to student-initiated groups defeats the broader purpose of the statute. A school with many faculty-initiated student groups can largely preempt demand for student-initiated groups. The result could be an open forum for mainstream interests and views, all sponsored by the faculty, with minority views excluded because

---

[9] A student group's selection criteria is relevant to the Mergens analysis where that criteria itself is directly related to the curriculum and student's performance therein.

of faculty hostility or indifference.") Thus, the court must focus on whether the group's subject matter is related to the school's curriculum.

Defendants also contend that YAC is related to the curriculum because its purpose is to assist the school counselors in the development and implementation of the material for which the counseling department is responsible. Defendants characterize the counseling department's material as part of the school's "curriculum" and argue that it is an important component of the overall instruction provided by the school. Plaintiffs, on the other hand, contend that the guidance program is not a course.

Defendants have provided no evidence of the existence of any regularly offered course that teaches the subject matter of YAC, namely prevention of teen pregnancy and substance abuse. Furthermore, defendants have failed to show that this subject matter concerns the body of courses as a whole. While this subject matter may relate to the guidance and counseling program and its services, defendants have failed to establish that this subject matter is related to any academic course.

The court again notes that the Supreme Court's definition of "curriculum related" focuses on academic courses. See Mergens, 496 U.S. at 239-40. The court recognizes that a school's guidance and counseling program and the services they offer are an important component of a student's comprehensive

22

education. Extracurricular activities and clubs are also valuable in this respect. The Supreme Court, however, consistent with its view that Congress intended to set a low threshold for triggering the EAA, provided a narrow definition of "curriculum related." Id. Despite defendants' argument that the guidance and counseling program is part of the school's "curriculum," the court concludes that this program and its services are auxiliary to the school's academic offerings and are not considered "courses" under Mergens.[10] Thus, the court finds that YAC is noncurriculum related and that, by permitting YAC the opportunity to meet on school premises during noninstructional time, defendants have created a limited open forum.

### e.    Prayer Group

With regard to this purported student group, there is no dispute that a student prayer group is a noncurriculum related student group. See Mergens, 496 U.S. 226. Plaintiffs assert that during the 2005-2006 school year, defendants recognized a student prayer group and permitted it to meet on school premises and enjoy school privileges. At the June 16, 2006 hearing, plaintiffs presented the testimony of several students who heard an announcement over the school's

---

[10] The court notes that defendants' contention that the counseling program is part of the school's curriculum is undermined by defendants' own conclusion that Students Against Drunk Driving and PRIDE are noncurricular as these groups are related to the program's subject matter of substance abuse prevention and conflict resolution/diversity awareness respectively.

public address system one morning near the beginning of the 2005-2006 school year regarding a gathering for prayer by the school flagpole.  Students also testified that, after the announcement, they observed several students leaving the school building, gathering around the flagpole in front of the school, joining hands, and bowing their heads.  Another of plaintiffs' witnesses testified that she observed some of these students meeting in the same fashion near the flagpole on one other occasion.  Defendants deny recognizing a student prayer group and dispute that they have permitted such a group to meet on school premises.

The court first notes that neither the EAA nor Mergens has defined the term "student group."  Although this term may seem self-explanatory, the lack of clear guidance creates some uncertainty.  The testimony presented by plaintiffs establishes that a group of students met on school premises to pray at least once and that they publicized their meeting via the school's public address system.  However, there has been no evidence that this was any more than several students who gathered for prayer on one or two occasions.  The lack of organization and consistency surrounding this alleged "student group" is troublesome.  Although the court acknowledges the "low threshold for triggering the [EAA's] requirements," the court does not believe that Congress intended for an unrecognized, unorganized group of students who met on one

or two occasions to engage in activities unrelated to the school's curriculum to trigger the Act's obligations.  <u>Mergens</u>, 496 U.S. at 240.  The court also notes that defendants have denied the FCA, the group formerly associated with meeting around the flagpole for prayer, official recognition or permission to meet on school premises during the 2005-2006 school year.

Nevertheless, the testimony regarding the public announcement of this group's meeting gives credence to plaintiffs' assertion that this group was recognized by the school.  The evidence demonstrates that this purported student group used the school's public address system to announce a meeting and met on at least one occasion in a conspicuous location on school premises.  Thus, defendants had actual or constructive notice of this meeting.[11]  The court finds that defendants permitted this noncurriculum related student group to meet on school premises during noninstructional time and have therefore created a limited public forum under the EAA.

---

[11] Defendants claim that they acted in good faith in denying official recognition to the FCA or to any "prayer group."  However, the evidence demonstrates that defendants did permit this noncurricular group to meet on school premises on at least one occasion and to use the school's facilities to publicize this meeting.  At the June 16, 2006 hearing, defense counsel expressed concern that the EAA may create a trap for the unwary such that an isolated incident such as the single announcement regarding this prayer group could create a limited open forum and thus require the school to recognize all student groups.  The EAA, however, requires only "equal access."  20 U.S.C. § 4071(a).  Therefore, where the only EAA violation was this type of isolated incident, the remedy would likely be narrowly-tailored.

### f.    Shotgun Team/4-H Club

The parties have stipulated that student groups known as Shotgun Team and 4-H Club are noncurricular student groups.  Off-campus meetings of these groups have been publicized using school resources such as the school public address system.  Furthermore, photographs of the 4-H Club appear in WCHS's 2005-2006 school yearbook.  The parties dispute whether either of these student groups has met on school premises during the 2005-2006 school year.

Defendants argue that the announcement of the off-campus meetings of these student groups is insufficient to trigger the requirements of the EAA. Defendants argue that they are bound by an agreement with the University of Georgia Cooperative Extension Service to cooperate in the operation of an extension education program that includes 4-H activities.  Defendants contend that they announce the off-campus activities and events of the 4-H Club pursuant to this agreement.  However, plaintiffs have presented evidence of a WCHS Morning Bulletin containing an announcement of a 4-H Club meeting in the school's media center.  Furthermore, it is clear that 4-H Club met on school premises to take pictures for the yearbook.  The court concludes that plaintiffs have presented sufficient evidence to show that the school "grant[ed] an offering to or opportunity for [4-H Club] to meet on school premises during

26

noninstructional time." 20 U.S.C. § 4071(b). Thus, the school has created a "limited open forum" under the EAA. Id.

### g.    Prom Group

Plaintiffs contend that defendants have permitted a group of students to meet on school premises during noninstructional time to help plan the prom. Plaintiffs contend that this so-called Prom Group is a "student group" within the meaning of the EAA and that this group is not directly related to the school's curriculum. Defendants dispute that any such recognized group exists. Defendants argue that this type of gathering of students does not qualify as a "student group" under the EAA.

The evidence presented at the June 16, 2006 hearing demonstrates that the prom is a school-sponsored event and that one teacher was given the responsibility of planning and preparing for the event. This teacher sought student volunteers to help plan the prom. Plaintiffs have presented evidence of Morning Bulletins containing announcements asking students to sign up to be on "Prom Committee." Other Morning Bulletins submitted by plaintiffs contain announcements of three separate meetings of Prom Committee throughout the course of the school year.

Defendants argue that this group of students who volunteered to assist in planning the prom is no different from a group of students recruited by the

school for any particular responsibility such as picking up trash left on the school grounds. However, the evidence submitted by plaintiffs demonstrates that this so-called Prom Group was more structured than the hypothetical group of trash collectors. Rather, the students who participated in Prom Group held meetings on school premises on a regular basis for the particular purpose of planning an event, received assistance from faculty, and were permitted to publicize their meetings over the school's public address system. The court finds that Prom Group, also known as Prom Committee, is a "student group" within the meaning of the EAA.

Defendants have made no attempt to connect Prom Group to the school's curriculum. The subject matter of this group is planning a social event and is unrelated to the subject matter of any regularly offered course or to the body of courses as a whole. There is no evidence that students participating in Prom Group received academic credit or that participation in this group is required for any particular course. Therefore, the court finds that this student group is noncurriculum related. As defendants have permitted this group to meet on school premises during noninstructional time, defendants have created a limited open forum.

### h.    Limited Open Forum

As the court has found that defendants have permitted one or more noncurricular groups to meet on school premises during noninstructional time, the court concludes that defendants have created a limited open forum at WCHS.  Thus, defendants are subject to the requirements of the EAA and may not "deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings."  20 U.S.C. § 4701(a).

Throughout the course of this litigation, defendants have maintained that Mr. Dorsey has made a good faith effort to adhere to the requirements of the EAA.  Defendants point out that the school system made a reasonable and lawful decision to limit student groups to those related to the school's curriculum.  Indeed, the Supreme Court has recognized that school districts "retain a significant measure of authority over the type of officially recognized activities in which their students participate" by "structur[ing their] course offerings and existing student groups to avoid the Act's obligations."  Mergens, 496 U.S. at 240-41.  Nevertheless, a school system that chooses to evade the EAA's equal access requirements must do so within the confines of the law.  The

court finds that, despite defendants' good faith efforts, they have run afoul of the EAA.[12]

The legislative history of the EAA makes it clear that the purpose of the Act was to confirm students' rights to freedom of speech, freedom of association, and free exercise of religion. See H.R. Rep. No. 98-710; S. Rep. No. 98-357. The legislative history also reveals that the main purpose of the EAA was to address student involvement in religious activities during extracurricular periods of the school day. Id. As enacted, however, the Act differs from the original bill in that it concerns religious, political, philosophical, and other activities. See 20 U.S.C. § 4071(a) (schools cannot discriminate against student groups based on "the religious, political, philosophical, or other content" of the group's speech).

Congress, through its enactment of the EAA, and the Supreme Court, through its interpretation of the term "curriculum related," have constructed a strict framework in which schools can operate with regard to student groups. See Mergens, 496 U.S. at 239 ("we think that the term 'noncurriculum related student group' is best interpreted broadly"). This court has serious doubts as

---

[12] Unfortunately for defendants, particularly Mr. Dorsey who has been given the task of determining which groups should be permitted under the school's new policy, Justice Stevens appears to have been correct in his prediction that the Mergens test would be "exceptionally difficult to apply even in the absence of deliberate evasion." 496 U.S. at 280 (Stevens, J., dissenting).

to the curriculum relatedness of other student activities, i.e. athletics, within this framework. This is disconcerting to the court, as, in its opinion, extracurricular and noncurricular activities are an integral part of a student's education. Although a school district has authority over these activities, under the EAA, it may not discriminate against any student group based on the content of its speech.

Plaintiffs have demonstrated that defendants maintained a limited open forum under the EAA. Plaintiffs have also presented evidence that they have been denied equal access to meet based on the content of their speech at such meetings. Therefore, the court finds that defendants have violated plaintiffs' rights under the EAA.

## 2. Constitutional Claims

Plaintiffs have also asserted that defendants' actions violate plaintiffs' rights to expressive association under the federal and state constitutions. The court has already found that defendants' denial of equal access to PRIDE based on the content of its speech violates the EAA. Having reached this determination, it is unnecessary for the court to address plaintiffs' constitutional claims for purpose of the pending motion. See In re Snyder, 472 U.S. 634, 642 (1985) (court may avoid constitutional issues when resolution of such issues is not necessary for disposition of a case).

### B.    Irreparable Injury

"An injury is 'irreparable' only if it cannot be undone through monetary remedies."  Cunningham v. Adams, 808 F.2d 815, 821 (11th Cir. 1987).  The Supreme Court has long held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976).  As the legislative history of the Act makes clear, the EAA protects these "expressive liberties."  See H.R. Rep. No. 98-710; S. Rep. No. 98-357.  Thus, the same presumption of irreparable harm has been applied in cases of violations of the EAA.  Hsu v. Roslyn Union Free Sch. Dist. No. 3, 85 F.3d 839, 872 (2d Cir. 1996) (denial of Bible group constituted "irreparable injury").  No monetary award can remedy the fact that plaintiffs are being denied equal access and a fair opportunity to meet within WCHS's limited open forum.  Thus, the court easily concludes that plaintiffs will be irreparably injured absent an injunction.

### C.    Balance of Harms

The court finds that the injunction will not cause great harm to defendants.  The injunction would simply prevent defendants from denying plaintiffs equal access and a fair opportunity to conduct a meeting within the school's limited open forum.  Defendants claim that the issuance of an injunction may cause further disruption at the school. Although the request to

form PRIDE may have caused community controversy, the meetings themselves have not caused disruptions. The burden on plaintiffs' expressive rights is a significant injury. Thus, the court concludes that the balance of hardships favors plaintiffs.

### D.   Public Interest

Finally, the court easily concludes that the injunction will not be contrary to the public interest. The public interest is certainly furthered when First Amendment freedoms are safeguarded. Furthermore, as the court has noted, extracurricular activities have significant educational value. PRIDE was not the only student group that was prohibited from meeting on school premises during the 2005-2006 school year. These other groups are also entitled to protection under the EAA. Although plaintiffs have raised claims only on behalf of PRIDE and its members, the injunction would also pertain to other student groups that have been denied equal access.

### III.   Conclusion

Based on the foregoing, plaintiffs' motion for injunctive relief [2-1] is hereby **GRANTED**. The court finds that defendants created a limited open forum at White County High School during the 2005-2006 school year. The court also finds that certain student groups, including plaintiffs, were denied equal access and a fair opportunity to conduct meetings on school premises.

Although the court believes that the school district can regulate student activities, the court has doubts as to whether White County High School could successfully do so in a manner that would be acceptable to the community. In the absence of a policy regarding student groups that complies with the requirements of the Equal Access Act, defendants are **ENJOINED** from (1) denying plaintiffs equal access or a fair opportunity to conduct a meeting on school premises during noninstructional time; and (2) discriminating against student groups on the basis of the religious, political, philosophical, or other content of their speech.

IT IS SO ORDERED, this 14th day of July, 2006.

s/ *William C. O'Kelley*
WILLIAM C. O'KELLEY
Senior United States District Judge